IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 2:22-CR-00240-CCW-1 |
| DENNY REYES-ROSARIO | |

## OPINION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Defendant Denny Reyes-Rosario is charged by Indictment with conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846, and possession with intent to distribute 500 grams or more of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B)(ii), on or about September 28, 2021. ECF No. 3.

On January 6, 2024, Mr. Reyes-Rosario filed a Motion to Suppress Evidence. ECF No. 48. Mr. Reyes-Rosario's Motion stems from a September 28, 2021 traffic stop of a vehicle he was operating and in which Anuedy Cuello-Santana was a passenger. *Id.* Trooper Ryan Marmol of the Pennsylvania State Police made the stop. *Id.* Mr. Reyes-Rosario asserts that his Fourth Amendment rights were violated and seeks to suppress all evidence seized during the traffic stop. ECF Nos. 48, 49.

On January 16, 2024, the United States filed a Response in Opposition to the Motion. ECF No. 51. The Court determined that an evidentiary hearing was warranted and, on March 13, 2024, held an evidentiary hearing on Mr. Reyes-Rosario's Motion. ECF No. 61.[1] Following the

---

[1] The evidentiary hearing, originally scheduled for February 7, 2024, was continued following two consent motions by defense counsel, and a third consent motion by the United States due to various scheduling conflicts.

evidentiary hearing, the Court ordered the transcript and directed the parties to file proposed findings of fact and conclusions of law no later than fourteen days after the transcript's filing. ECF No. 63. The hearing transcript was filed on March 22, 2024, making the parties' filing deadline April 5, 2024. ECF No. 64. On April 4, 2024, the United States filed its Proposed Findings of Fact and Conclusions of Law. ECF No. 65. On April 5, 2024, Mr. Reyes-Rosario filed his Proposed Findings of Fact and Conclusions of Law. ECF No. 66. Accordingly, Mr. Reyes-Rosario's Motion is now ripe for adjudication.

## I.  Background

Mr. Reyes-Rosario challenges the lawfulness of the initial traffic stop and contends that the traffic stop was unlawfully extended, in violation of *Rodriguez v. United States*, 575 U.S. 348 (2015). ECF Nos. 49, 66. The United States argues that the initial traffic stop was lawful because it was supported by reasonable suspicion, and that at the time the traffic stop was extended, Trooper Marmol had reasonable suspicion of criminal activity, rendering any extension lawful. ECF Nos. 51, 65. The parties disagree as to when the *Rodriguez* moment occurred and therefore which facts the Court can consider in determining whether Trooper Marmol had reasonable suspicion to extend the stop.

At the evidentiary hearing, Trooper Marmol testified on behalf of the United States. ECF No. 61. Based upon Trooper Marmol's demeanor and testimony in response to questions, the Court finds his testimony regarding the traffic stop to be credible, despite efforts at impeachment. *United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985) ("[W]hen findings are based on determinations regarding the credibility of witnesses" and there are "two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous" because "only the trial judge can be aware of the variations in

demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.")). The United States introduced one exhibit, video footage of the stop from the dash camera recording device ("MVR") in Trooper Marmol's police cruiser. Mr. Reyes-Rosario, through counsel, cross-examined Trooper Marmol but did not introduce any evidence or present witnesses.

Trooper Marmol has worked for the Pennsylvania State Police for over 11 years. ECF No. 64, Tr. 4:21–23. He has received training in a number of areas, including traffic enforcement, *Id.* at Tr. 5:22–23, training on how to detect drivers who may be impaired by narcotics, *Id.* at Tr. 6:25–7:3, as well as specialized training through the Pennsylvania State Police's SHIELD program, *Id.* at Tr. 7:4–5. SHIELD training included highway interdiction training, in which he learned roadside interview techniques, and how to disrupt individuals that are involved in criminal activity as they're traversing the highway, including how to interdict smugglers of drugs or other contraband. *Id.* at Tr. 6:20–9:19. Trooper Marmol also received training on drug source locations and destinations, drug corridors, and nervous and deceptive behaviors. *Id.* at Tr. 9:20–10:3. SHIELD, of which Trooper Marmol has been a member for seven years, is a highway criminal interdiction team. *Id.* at Tr. 8:8–9; 8:19–21; 10:14–17. The acronym stands for Safe Highway Initiative through Effective Law Enforcement Detection. *Id.* at Tr. 8:8–9. When SHIELD team members are out on the highway, they "interject [themselves] and make [themselves] highly visible along the interstate" to "slow traffic down and try to prevent crashes." *Id.* at Tr. 8:13–15. They also "conduct traffic stops, and [are] able to ferret out criminal activity if it's present." *Id.* at Tr. 8:162–17. Trooper Marmol's responsibilities also include enforcing the Pennsylvania Motor Vehicle Code. *Id.* at Tr. 12:25–13:3. He estimated that he had participated in approximately 1,700 traffic stops as part of SHIELD. *Id.* at Tr. 13:4–6. He did not recall issuing a traffic citation during

3

those stops, but testified that, if there is a Motor Vehicle Code violation, it is generally his practice to give either a verbal or written warning. *Id.* at Tr. 85:22–25; 86:8–13.

Trooper Marmol testified that that at approximately 10:45 a.m. on September 28, 2021, while in a stationary position on the Pennsylvania Turnpike in an unmarked patrol car, he observed a BMW-X5 traveling eastbound in the left lane without passing another vehicle for approximately four or five tenths of a mile. ECF No. 64, Tr. 17:1–23. Trooper Marmol testified that the BMW's conduct was a violation of the Pennsylvania Motor Vehicle Code. *Id.* at Tr. 17:24–18:1. Trooper Marmol pulled out behind the BMW and observed a cellular device of some sort attached to the front windshield of the vehicle, which he testified was also a violation of the Pennsylvania Motor Vehicle Code. *Id.* at Tr. 18:2–10. Once at a safe location, at approximately 3:37 on the MVR, Trooper Marmol pulled the BMW over to conduct a traffic stop. *Id.* at Tr. 22:24–23:2. Trooper Marmol approached the vehicle on the front passenger side and once the window was down, he smelled a masking agent and saw an air freshener hanging from the passenger side roof area. *Id.* at Tr. 23:24–24:18. Trooper Marmol asked the driver, Mr. Reyes-Rosario, for his license. *Id.* at Tr. 24:19–26:3. Mr. Reyes-Rosario provided his driver's license and underneath was a card resembling a police benevolent card or courtesy card. *Id.* at Tr. 24:19–26:3, 26:15–21. Trooper Marmol noticed that Mr. Reyes-Rosario's hands were visibly shaking when he provided the driver's license. *Id.* at Tr. 25:10–14. Trooper Marmol also requested the "paperwork for the vehicle." MVR 0:03:51. Mr. Reyes-Rosario provided the vehicle registration. *Id.* Trooper Marmol then asked Mr. Reyes-Rosario to exit the BMW so that the Trooper could "tell [Mr. Reyes-Rosario] why [he] pulled [him] over and to check everything out." *Id.* at Tr. 26:9–15; MVR 0:03:58–0:04:03.

While standing at the rear of the BMW with Mr. Reyes-Rosario, Trooper Marmol discussed the two motor vehicle code violations that he observed and asked Mr. Reyes-Rosario a question regarding the car's paperwork and Mr. Reyes-Rosario's address. ECF No. 64, Tr. 27:8–28:7. Trooper Marmol then asked Mr. Reyes-Rosario to come with him to his patrol car while he "checks everything out," such as verifying the driver's license and registration of the vehicle and running a wants and warrants check. *Id.* at Tr. 65:11–21. Trooper Marmol sat in the driver's seat of the patrol car while Mr. Reyes-Rosario stood outside the patrol car's passenger window. MVR 0:05:08. While Trooper Marmol was inputting Mr. Reyes-Rosario's information into the patrol car's computer, he was having a conversation with Mr. Reyes-Rosario. ECF No. 64, Tr. 29:5–14. The conversation lasted approximately 3 minutes and included Mr. Reyes-Rosario's travel plans, follow-up questions, discussions regarding Mr. Reyes-Rosario's work as a Lyft driver, and identification of the car's passenger. *Id.* at Tr. 29:9–32:21; MVR 0:05:08–7:56. Regarding his travel plans, Mr. Reyes-Rosario stated that he had been driving for approximately 45 minutes that morning, that he came into the area at approximately 3:00 a.m. that morning, that he was visiting a friend whose wife had recently died, that he had been in Donora, Pennsylvania, and that he was traveling back to New York. ECF No. 64, Tr. 29:9–32:21; MVR 0:05:08–0:08:14. During the conversation, Trooper Marmol also performed a criminal history check on Mr. Reyes-Rosario that showed Mr. Reyes-Rosario had been previously arrested for alien smuggling, possession with intent to distribute, and a DUI. ECF No. 64, Tr. 32:7–21.

After completing the criminal history check, Trooper Marmol said that he was going back to the car to have the passenger get the insurance information. *Id.* at Tr. 34:15–18. At approximately 8:25 on the MVR, as he is exiting the patrol car, Trooper Marmol stated into the microphone "Something is going on here. I knew that right of out of the gate." *Id.* at Tr. 34:19–

34:24. Trooper Marmol left his patrol car and went to the BMW to obtain the insurance information, while he had Mr. Reyes-Rosario wait in the same position by the patrol car. MVR 0:08:28–0:10:48. Trooper Marmol asked the passenger, Mr. Cuello-Santana, to provide the insurance information. *Id.*; ECF No. 64, Tr. 37:7–38:18. While Mr. Cuello-Santana looked for the insurance information, Trooper Marmol asked him about his travel plans. *Id.*; MVR 0:08:28–0:10:48. Mr. Cuello-Santana stated that he "went to Pennsylvania" but could not identify where in Pennsylvania and did not currently know where he was in Pennsylvania. MVR 0:08:54–0:10:48.

Trooper Marmol returned to the patrol car after Mr. Cuello-Santana could not locate the insurance information. *Id.* At approximately 11:05 on the MVR, Trooper Marmol stated into the microphone: "older vehicle; recently registered; 4 year old vehicle recently registered; when he handed me his ID and everything his hands was shaking; police benevolent card; implausible travel plans; quick trip…." MVR 0:11:05–0:11:23; ECF No. 64, Tr. 39:4–17. At approximately 11:25 on the MVR, Trooper Marmol realized that he had forgotten to obtain Mr. Cuello-Santana's identification and exited the patrol car to return to the BMW. Trooper Marmol asked Mr. Cuello-Santana for his identification and where he lives before returning to the patrol car. MVR 0:11:30–0:12:10. At approximately 14:20 on the MVR, Trooper Marmol asked Mr. Reyes-Rosario questions regarding his education and then Trooper Marmol asked for, and Mr. Reyes-Rosario gave, verbal and written consent to the search the BMW. ECF No. 64, Tr. 47:5–25.

**II.     Discussion**

Mr. Reyes-Rosario contends that suppression of evidence found in the BMW is warranted because the initial traffic stop was pretextual, and therefore, unlawful; and because the stop was unlawfully extended without reasonable suspicion.

A.     The Initial Traffic Stop Was Valid

First, Mr. Reyes-Rosario challenges the legality of the initial traffic stop. ECF No. 49 at 7–10. He contends that the traffic stop was subterfuge for Trooper Marmol to conduct a drug investigation and that the Trooper lacked reasonable suspicion to make the stop. *Id.* The United States responds that Trooper Marmol had reasonable suspicion that Mr. Reyes-Rosario committed multiple traffic violations, and that even if Trooper Marmol was mistaken factually, such a mistake does not defeat a finding of reasonable suspicion. ECF No. 65 at 7.

"The Fourth Amendment protects individuals 'against unreasonable searches and seizures.'" *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (quoting U.S. Const. amend. IV). "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). "Because an ordinary traffic stop is analogous to an investigative detention," *id.*, "[t]raffic stops are classified as a type of *Terry* stop, and may be initiated based on a reasonable suspicion that a traffic violation has occurred." *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (citing *Navarette v. California*, 572 U.S. 393, 396–97 (2014); *Delfin-Colina*, 464 F.3d at 396–97. "In *Whren v. United States*, 517 U.S. 806 (1996), the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop . . . ." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).

The Court finds that the traffic stop was supported by reasonable suspicion and is therefore lawful. Trooper Marmol credibly testified that he observed the BMW-X5 traveling in the left lane without passing a vehicle, that he observed a cellphone or other object mounted to the windshield of the BMW, and that he understood both of those circumstances to be violations of the Pennsylvania Motor Vehicle Code. Mr. Reyes-Rosario offers plausible reasons why Mr. Reyes-

7

Rosario could be traveling in the left lane in a manner that is consistent with the Motor Vehicle Code. Nevertheless, Trooper Marmol has provided specific, articulable facts showing that he reasonably believed that that Mr. Reyes-Rosario was in violation of the driving in the right lane provision. *Delfin-Colina*, 464 F.3d at 400 ("[A]n officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place."). Traveling in the left lane without passing another vehicle is a violation of Pennsylvania Motor Vehicle Code § 3313(d) and placing or attaching an object in a position to materially obstruct, obscure or impair the driver's vision through the front windshield is a violation of Pennsylvania Motor Vehicle Code § 4524(c).

Accordingly, the Court finds that the traffic stop was a valid *Terry* stop initiated based on reasonable suspicion of a traffic violation. Thus, the traffic stop of Mr. Reyes-Rosario was lawful under the Fourth Amendment. *See Green*, 897 F.3d at 178 (affirming district court finding that initial stop based on speeding violation was lawful).

### A. The Traffic Stop Was Not Unlawfully Extended

Mr. Reyes-Rosario next argues that Trooper Marmol unreasonably extended the traffic stop without reasonable suspicion. ECF No. 49 at 12–13. The parties proffer dueling *Rodriguez* moments, each of which the Court will address. They also dispute whether Trooper Marmol had reasonable suspicion to extend the stop.

#### 1. Legal Standard

The purpose of a traffic stop is "to address the traffic violation that warranted the stop, and attend to related safety concerns," *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citation omitted), such as "checking the driver's license, determining whether there are outstanding

warrants against the driver, and inspecting the automobile's registration and proof of insurance," *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (quoting *Rodriguez*, 575 U.S. at 355).

"[O]nce a car has been legally stopped, the police may 'escalate' the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants." *Mosley*, 454 F.3d at 252 (citing *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)). If the officer then has a reasonable, articulable suspicion of criminal activity, he or she may expand the scope beyond the initial reason for the stop and detain the person and the vehicle for further investigation. *Id.* (citing *Givan*, 320 F.3d at 458). Although an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," he or she "may not do so in a way that prolongs the stop" without reasonable suspicion. *Rodriguez*, 575 U.S. at 355.

"An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *United States v. Burrus*, 845 F. App'x 187, 189 (3d Cir. 2021) (quoting *Green*, 897 F.3d at 179). Thus, the Court looks for the "*Rodriguez* moment," which is the time "when tasks tied to the traffic stop are completed or reasonably should have been completed . . . ." *Burrus*, 845 F. App'x at 189 (quoting *Garner*, 961 F.3d at 270). First, the Court determines when the stop was "measurably extend[ed]." *Green*, 897 F.3d at 179 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). If an officer measurably extends a stop, the Court "must 'assess whether the facts available to [the officer] at [the *Rodriguez* moment] were sufficient to establish reasonable suspicion' of criminal activity to determine whether the extension violated the Fourth Amendment." *Burrus*, 845 F. App'x at 189 (quoting *Green*, 897 F.3d at 179).

The Third Circuit has described "reasonable suspicion" as follows:

> Reasonable suspicion is more than a mere hunch but considerably less than a preponderance of the evidence, and obviously less than probable cause. It must be evaluated under the totality of the circumstances and cannot be defeated by a so-called "divide-and-conquer" analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each. We have also recognized the particular ability of law enforcement officers, based on training and experience, to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. Reasonable suspicion depends on both the information possessed by police and its degree of reliability.

*Burrus*, 845 F. App'x at 190 (cleaned up).

District courts must "review reasonableness through an objective lens, and should not consider the actual or subjective intentions of the officer involved." *United States v. Hunter*, 88 F.4th 221, 224 (3d Cir. 2023) (cleaned up). "Courts give considerable deference to police officers' determinations of reasonable suspicion." *Mosley*, 454 F.3d at 252.

### 2. Analysis

Mr. Reyes-Rosario asserts that Trooper Marmol measurably extended the stop or went off-mission at three points: (1) as soon as Mr. Reyes-Rosario was pulled over, MVR 0:03:37; (2) when Trooper Marmol directed Mr. Reyes-Rosario out of his car to the rear of the BMW-X5 and then directed him to stand at the window of the patrol car, MVR 0:04:57; and (3) when Trooper Marmol went to question the passenger, Mr. Cuello-Santana, as he attempted to obtain the insurance information, MVR 0:08:25. ECF No. 66 at 11–15.

The United States responds that Trooper Marmol was on-mission and conducting the business of the traffic stop during each of Mr. Reyes-Rosario's proffered *Rodriguez* moments, such that there was no extension of the stop at those times. ECF No. 65 at 5, 9. The United States contends that any *Rodriguez* moment occurred later, once Trooper Marmol returned from Mr. Reyes-Rosario's car after attempting to obtain the insurance information from Mr. Cuello-Santana. *Id.* at 11; MVR 0:11:05. Or, if the *Rodriguez* moment occurred at an earlier point in time, the United States contends it happened at the end of the first conversation between Trooper Marmol and Mr. Reyes-Rosario at the patrol car, MVR 0:08:25, which is Mr. Reyes-Rosario's third proposed *Rodriguez* moment. In either scenario, however, the United States contends that Trooper Marmol had reasonable suspicion to extend the stop. *Id.*

### a.   Trooper Marmol's Subjective Intent is Immaterial

The core of the dispute regarding when the *Rodriguez* moment occurred comes down to whether it is appropriate for the Court to consider Trooper Marmol's subjective intent. Defendant's argument is essentially that Trooper Marmol, from the inception of the stop, was intending to, and did conduct a drug investigation, rather than intending to address a Motor Vehicle Code violation. Therefore, in Defendant's view, the traffic stop was pretextual from the start, or if not, Trooper Marmol lacked reasonable suspicion at every turn because he was off-mission. ECF No. 66 at 8. In support of this view, Mr. Reyes-Rosario points to several facts, including that in the approximately 1,700 traffic stops that Trooper Marmol has performed since 2016, he has not issued a citation. ECF No. 66 at 9; ECF No. 64, Tr. 85:12–25. He also points to Trooper Marmol's testimony that he made the decision to extend the traffic stop at 5:27 on the MVR, prior to speaking to the passenger and prior to performing the wants and warrants check. ECF No. 66 at ¶¶ 63–65; ECF No. 64, Tr. 69:9–71:18. He further points to Trooper Marmol's admission that

11

when he went to obtain the insurance information from passenger Mr. Cuello-Santana, he did so to separate the parties and determine whether Mr. Cuello-Santana's story was consistent with Mr. Reyes-Rosario's. ECF No. 66 ¶¶ 66–67; ECF No. 64, Tr. 77:18–78:24; 83:7–83:21. The United States counters that Trooper Marmol was continually performing the business of the traffic stop and argues that "a police officer's subjective intentions are of minimal importance in a Fourth Amendment analysis." ECF No. 65 at 11–12.

The Third Circuit has made clear that an officer's subjective intent is "immaterial" and should not be considered by the Court in assessing reasonableness. *Hunter*, 88 F.4th at 224 (reversing District Court's suppression of evidence where the court relied on the subjective intent of the office rather than objective actions). Instead, the Court must *objectively* evaluate the officer's conduct to see whether it was reasonably within the mission of the traffic stop, or off-mission, and whether it measurably prolonged the stop. *Scott v. United States*, 436 U.S. 128, 137 (1978) ("We have since held that the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as along as the circumstances, viewed objectively, justify that action."); *United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018) ("We review objectively the officer's rationale, by looking to the facts and circumstances confronting him or her, to determine whether his or her actions during the stop were reasonable.").

        **b.**      **Trooper Marmol Was Conducting the Business of the Traffic Stop During Mr. Reyes-Rosario's Proposed *Rodriguez* Moments**

Having carefully considered Trooper Marmol's actions during the traffic stop through that objective lens, the Court agrees with the government that the earliest a Rodriguez moment could have occurred is once Trooper Marmol returned to the patrol car after attempting to obtain the insurance information from Mr. Cuello-Santana at approximately 11:05 on the MVR. Until this

point in time, the Court finds that Trooper Marmol was performing the business of the traffic stop. Mr. Reyes-Rosario's arguments for an earlier Rodriguez moment based on Trooper Marmol's subjective intent during the traffic stop are foreclosed by Third Circuit law.

Mr. Reyes-Rosario's first proposed *Rodriguez* moment, when Trooper Marmol pulled over the BMW and began speaking with Mr. Reyes-Rosario, is easily rejected. Mr. Reyes-Rosario argues that because the traffic stop was pretextual, it was off-mission immediately. This argument has been raised before and fails. *United States v. Wilburn*, No. 2:18-cr-115, 2021 WL 1310423, at *27 (W.D. Pa. April 8, 2021) (Hornak, C.J.) (rejecting defendant's argument that the officer immediately went off-mission when he began speaking to the car's occupants because the traffic stop was pretextual). The Court has previously determined that Officer Marmol had reasonable suspicion that a traffic violation had occurred, and that the initial stop was lawful.

Mr. Reyes-Rosario's second proposed *Rodriguez* moment, when Trooper Marmol directed Mr. Reyes-Rosario to the back of the BMW-X5 and then to the passenger side of Trooper Marmol's patrol car window, will too be rejected. Mr. Reyes-Rosario argues that the separation of Mr. Reyes-Rosario and Mr. Cuello-Santana "was merely a tactic to further the drug investigation and an effort to develop reasonable suspicion." ECF No. 66 at 12. Again, the subjective intent of Trooper Marmol cannot be considered. While at the patrol car, Trooper Marmol was conducting the business of the traffic stop while he engaged in conversation with Mr. Reyes Rosario.[2] The video of the traffic stop shows Trooper Marmol typing and verifying the

---

[2] Mr. Reyes-Rosario also cites *United States v. Horsford*, No. 3:21-CR-243, 2022 WL 2177447 (M.D. Pa. June 16, 2022) in support of his argument that the *Rodriguez* moment occurred when Mr. Reyes-Rosario was directed to stand by the patrol car. *Horsford*, in which the officer required the defendant to go to his patrol car in order to prepare the warning he was to receive, is distinguishable because the officer had already decided and told the defendant that he was not going to get a ticket and that he was only going to a get a warning *prior* to bringing the defendant to stand by the patrol car. 2022 WL 2177447, at *10. Here, Trooper Marmol was still conducting the business of the traffic stop when he directed Mr. Reyes-Rosario to go to his patrol car. *See United States v. Wilkenson*, No. 3:22-CR-113, 2023 WL 5103364, at *7 (M.D. Pa. Aug. 9, 2023) (holding that when defendant was asked to exit his vehicle and stand by

13

information provided by Mr. Reyes-Rosario during this time. The majority of the questions Trooper Marmol asked Mr. Reyes-Rosario related to his travel plans and fell within the scope of the traffic stop. *Garner*, 961 F.3d at 271 ("…some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop…"); *Wilburn*, 2021 WL 1310423, at *27. To the extent any of the questions were extraneous to the mission of traffic stop,[3] the questioning did not measurably extend the traffic stop because Trooper Marmol had not yet completed running the driver's license, registration, and criminal history check. *United States v. Stanger*, No. 4:21-CR-00264, 2023 WL 1071648, at *4 (M.D. Pa. Jan. 27, 2023) (holding that where officer questioned defendant while checking car's registration, running defendant's driver license, checking her criminal history and any documentation, even if officer's "questions could be deemed extraneous" or "may well have exceeded the scope of the traffic stop," "they did not in any manner extend the length of the stop").

Mr. Reyes-Rosario's third proposed *Rodriguez* moment, when Trooper Marmol went to obtain the insurance information from the passenger, Mr. Cuello-Santana, is likewise rejected. Obtaining insurance documents is within the scope of the traffic stop. *Rodriguez*, 575 U.S. at 355 (listing inspection of proof of insurance as an ordinary inquiry of the traffic stop). Mr. Reyes-Rosario argues that Trooper Marmol should have asked or sent Mr. Reyes-Rosario to obtain the insurance information, as opposed to the passenger. But, objectively, the Court finds that it was

---

patrol car this was not the *Rodriguez* moment, since Defendant had not presented any valid insurance information and "locating the insurance information remained a basic and necessary element of the traffic stop, and it had not yet been resolved.").

[3] Trooper Marmol asked the following questions during the course of the conversation with Mr. Reyes-Rosario that may be extraneous: after Defendant discussed that his travel plans included going to a funeral and describing that his friend's wife died, the Trooper followed up with: "So his mom died?"; "His wife died, how did she die?." And later, after Defendant volunteered what his job was, that he drove for Lyft, the Trooper had trouble understanding the response and followed up with "You're an [U]ber driver?"

14

not unreasonable for Trooper Marmol to ask Mr. Cuello-Santana, who was still in the BMW, to obtain the insurance documents. *See United States v. Jones*, No. 2:21-cr-17, 2023 WL 5488022, at *3, *6 (finding *Rodriguez* moment to be after trooper requested insurance information from the passenger who was still in the vehicle while driver was outside the vehicle). Further, since Trooper Marmol's questioning occurred while Mr. Cuello-Santana was looking for the insurance documents, any questions that arguably deviated from this topic did not extend the stop. *Stanger*, 2023 WL 1071648, at *4.

   c. **Trooper Marmol Had Reasonable Suspicion to Extend the Traffic Stop**

Having concluded that the earliest possible *Rodriguez* moment occurred when Trooper Marmol returned to the patrol car, at 11:05 on the MVR, the Court will evaluate whether Trooper Marmol had reasonable suspicion to extend the stop at that time. The Court concludes that under the totality of the circumstances, viewed objectively, the facts available to Trooper Marmol were sufficient to establish reasonable suspicion of criminal activity.[4] Trooper Marmol stated, and the government argues, that there were a number of observations, based on his training and experience, that contributed to his development of reasonable suspicion: (1) the Pennsylvania Turnpike is a known drug smuggling corridor; (2) the BMW-X5 was an "older vehicle" but was newly registered, and criminal organizations often re-register their vehicle to avoid law enforcement detection; (3) there was no license plate bracket affixed to the vehicle, which criminal organizations often remove so that the vehicle can't be tied to a specific high crime or drug area; (4) the BMW was registered out of the Bronx, which is a known source area for distribution of narcotics; (5) BMW-X5's are frequently used by criminal organizations because they can be outfitted with an aftermarket hidden compartment; (6) he smelled a masking agent and saw an air

---

[4] Mr. Reyes-Rosario argues that the *Rodriguez* moment occurred earlier, and he has not addressed whether Trooper Marmol did or did not possess reasonable suspicion at this point in the traffic stop.

freshener, which can be used to conceal the odor of narcotics;  (7) Mr. Reyes-Rosario provided a courtesy card, which in Trooper Marmol's experience, had been provided to him in traffic stops that resulted in drug seizures;  (8) Pittsburgh is a destination and distribution area and Mr. Reyes-Rosario was leaving the Pittsburgh area;  (9) Mr. Reyes-Rosario's hand was visibly shaking when he provided his driver's license;  and (10) Mr. Reyes-Rosario's description of his travel plans, including the quickness of his trip, was implausible, and seemed like a "cover story."  ECF No. 65 at 11;  ECF No. 48-2 at 5–6;  ECF No. 64, Tr. 34:19–37:6.  In an effort to combat reasonable suspicion, Mr. Reyes-Rosario attempts to separate "the 'indicators' that SHIELD looks for when they are stopping a vehicle," i.e. observations 1-5 and 8, from the "only two other things the Trooper considered before making the determination to extend the stop," i.e. observations 9-10.  ECF No. 66 at 11.  However, reasonable suspicion must be evaluated under the totality of the circumstances and cannot be defeated by a so-called "divide-and-conquer" analysis.  *Burrus*, 845 F. App'x at 190.  In addition to the listed observations, at the time of the *Rodriguez* moment, Trooper Marmol was also aware that:  (11) Mr. Reyes-Rosario had a prior drug-related arrest;  and (12) passenger Mr. Cuello-Santana was unaware of where he was and where he had come from in Pennsylvania.[5]

Thus, considering the totality of circumstances, objectively, the facts available to Trooper Marmol established reasonable suspicion that Mr. Reyes-Rosario was engaged in criminal activity

---

[5] Courts have recognized that observations like Trooper Marmol's contribute to reasonable suspicion.  *See United States v. Robinson*, 529 F. App'x 134, 138–39 (3d Cir. 2013) (holding that officer possessed reasonable suspicion where, amongst other factors, Pennsylvania Turnpike is a drug smuggling corridor, the defendant had unusual travel plans, defendant had criminal history, and strong odor from air fresheners); *Garner*, 961 F.3d 264 at 272 (holding the officer possessed reasonable suspicion to extend the traffic stop where, in part, the officer "smelled a strong odor of air freshener and saw air fresheners clipped on every vent");  *Burrus*, 845 F. App'x at 190–91 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").

such that any extension of the stop after Trooper Marmol attempted to obtain the insurance information was permissible.

### III. Conclusion

For the foregoing reasons, Mr. Reyes-Rosario's Motion to Suppress, ECF No. 48, is DENIED.

DATED this 3rd day of May, 2024.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record


such that any extension of the stop after Trooper Marmol attempted to obtain the insurance information was permissible.

### III. Conclusion

For the foregoing reasons, Mr. Reyes-Rosario's Motion to Suppress, ECF No. 48, is DENIED.

DATED this 3rd day of May, 2024.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record